or constructive possession, but the firearm, the sawed-off shotgun, whether or not that's an antique firearm. It seems to me to be that. Now, the gun was made before 1898, obviously. That's correct, Your Honor. Now, the question then becomes, when you look at the statutory provision, it really looks at the ammo as I analyze it. And, you know, 12-gauge shotgun shells technically fit in this bore, do they not? That is correct, Judge. Special Agent Craze from ATF was successful in firing a 12-gauge shotgun shell from this shotgun. However, respectfully, Your Honors, I don't believe that that's what the statute calls for. As the Court is aware, there are two provisions in the statute dealing with antique firearms. The second portion, the final sentence, is what controls, I believe, because this is a firearm using fixed ammunition. So in order for it to be an antique… What is fixed ammunition? Is a 12-gauge shotgun shell fixed ammunition? Yes, sir. Fixed ammunition is what you would consider in the movies a regular type of ammunition, which you would put in a gun, as opposed to a flintlock or something, which would be a colonial-era rifle where you would pour powder down the muzzle, tamp it down, and those types of things. But then the government would argue that if you concede that it's… Well, we have to. It is using fixed ammunition. And while the ammunition isn't manufactured in or before 1898, therefore, this exception doesn't apply because the ammunition is readily available in the ordinary channels of commercial trade. Well, that's the crux of the argument. And why isn't the Second Circuit's decision in Tribunella persuasive? Well, Your Honors, I would argue that in Tribunella there are a couple of factors going on. I don't presume to speak for the Second Circuit in how they were handling the case, but that was a much different case than this one, factually. Why was it different? Factually different because the firearm in Tribunella was being sold in an illegal fashion. This was a family heirloom that was mounted on the wall. It should not have an… I respectfully submit, Judge Ackerman, that that should not have a basis in the decision, but I think the Second Circuit, with all due respect to them, overreached in that case a little bit. When I hear the words, with all due respect… You know something's coming. You know something's coming, sir. They overreached a little bit in there and didn't look at the clear meaning of the statute. I would submit to this Court, and there is no case in the Third Circuit that's directly decided this point, I would submit that this Circuit's history, at least in the 26 years I've been practicing law, is to strictly construe statutes. And if we accept the Tribunella version and the government's version of the case, you're pretty much going to eviscerate totally that second test in the statute because no matter what kind of gun it is, somebody at ATF is going to be able to find a projectile that's going to be fired from it. You're just going to eviscerate the whole thing. Isn't that speculation, counsel? No, sir. Somebody's going to find ammunition? I mean… Judge, this shotgun was originally manufactured in Belgium in 1893 and was designed to fire an 18.2-millimeter shell, which is no longer manufactured. It was a paper shell that was designed to be fired from this weapon. The fact that you could go out and put a 12-gauge shotgun shell in it and test fire it, I respectfully submit, doesn't mean that it's not an antique weapon. Furthermore, in Tribunella there was testimony from the defense side that if you fire this gun more than a couple of times, you're going to blow it up. Yeah, I was wondering, why didn't the thing blow up? If it's designed for a paper shell and you put a 12-gauge shotgun in there, why wouldn't it? Judge, this weapon was 111 years old when it was seized. It was a family heirloom, belonged to Mr. Introcaso's great-grandfather, not his great-great-grandfather. There's a typo in part of my brief there. But this was an item that was a family heirloom and was mounted on the wall, unloaded with a trigger lock in it. It's extremely unlikely that this gun would ever have been used for any type of animal. Yeah, but that's not right. It was the only firearm that was not registered. That was the only firearm that was charged, Judge. Yes, there were various other firearms that were seized, that were registered, and did not result in any criminal charges regarding those. Including grenades. Well, the grenades properly did result in criminal charges, Judge. But it's our position that what has to control is what the weapon was designed or manufactured to fire. A 111-year-old short-barreled shotgun is not a weapon that someone can use on the street. Well, I'm not so sure about that. Well, on any kind of consistent basis, Judge, and it's not the kind of weapon that – and I've seen people do some pretty stupid things over the course of this time, as I know your honors have also, but it's not the kind of weapon that somebody's going to look for to go out on the street. I mean, if you put a 12-gauge shotgun in there, it's just as – I submit to the Court it's just as likely to blow up the barrel as it is to expel a projectile. And basically – But that really isn't the test, though. I believe it is the tester because I think the statute should be read to cover the type of ammunition that the weapon was designed to fire. Well, that's what it says. That's what it says. Yes. And not that you can put a 12-gauge shotgun shell in there and do that. I can't think of a weapon that you couldn't fire some sort of modern bullet through. Basically, if we accept the tribunella version in the Second Circuit, as I've said before, this sentence becomes meaningless. We might as well strike it right out of the statute. And this is, with all due respect, your honors, the quintessential kind of weapon that we're talking about here. This was something that was, as I said before, a family heirloom, was mounted on the wall with a trigger lock next to Mr. Introcaso's great-grandfather's credentials as a law enforcement officer. What spawned the desire to have a charge on this particular weapon? I have no idea, Your Honor. I was not trial counsel. I suspect that if the hand grenades were not found on the premises, the U.S. Attorney's Office may have had a more difficult charging decision than they did. But that's the crux of the firearm argument. If the panel has no more questions in that regard, I would respectfully move on to the constructive possession issue. This, as I said, is these explosive devices were seized from the Introcaso marital residence on February 9, 2004. Mr. Introcaso was himself barred from the premises as a result of the petition for protection. But that was a fairly recent petition. He had not been barred for that long. No, that was one week prior. And she didn't have a key because they had to use bolt cutters to get the chain off. That's correct, Your Honor. She didn't have a key. So why couldn't the jury infer that, well, somebody put them in there? And there's testimony that from employees, I guess, or household helpers, that they had seen these grenades, I guess it was, in the cabinet, or grenades that looked identical to these grenades, in the cabinet that he had access to. Why wasn't that enough for constructive possession? Well, respectfully, Your Honor, those items were similar, but this falls within the square parameters of U.S. v. Brown and his progeny, in that there must be some sort of dominion or control over these items. And Mrs. Introcaso didn't have a key. Mr. Introcaso, there's been no testimony that he ever had a key. There's been no testimony at all about who had control over this locked cabinet. But what would they need to be? If two people live in the house and they exclude one person from having control over the cabinet, someone put this stuff in there and put a chain on it, why couldn't the jury conclude, well, she didn't do it, he must have done it? That's right. Because other than the suggestion, which I'm listening to here, that someone other than Mr. Introcaso may have placed the explosive devices in the locked metal cabinet in Introcaso's home, what evidence was presented at trial to support that inference? Tell me. No evidence, Your Honor. Thank you. And respectfully, that's not the defense's burden. It's the government's burden to prove all the elements of the case. And part of the elements of the case is to prove constructive possession of those explosive devices. And respectfully, I don't think the record supports an inference that the jury could make for constructive possession of these devices. But somebody put them in there. Someone put them in there. Absolutely, Judge. It wasn't the tooth fairy. Absolutely, Judge. And she didn't have a way of getting them out. She didn't have a key to the – since we have a real good argument under the statutory definition of antique firearm, the constructive possession thing. I know you don't want to waive it. Well, Your Honor, if I can address that for a moment. I had a law professor that I respected a lot of years ago at school told me that there's no such thing as a jury verdict of innocence. There's just a verdict of guilty and not guilty. So if we were looking for a verdict of innocence here, then maybe we would need to prove exactly who put those hand grenades in there. This isn't the Wild West where the sheriff – It's starting to look like it. What time was this? It looks awful, except they didn't have hand grenades back then. Well, Judge, this isn't like the movies where you have to break out of jail and bring in the cattle rustler and prove that you didn't rustle the cattle. I mean, the government has the burden of proving the constructive possession of these explosive devices, and that wasn't done here. So we shouldn't have a – respectfully, there shouldn't be a verdict of innocent here. There should be a verdict of not guilty because the government hasn't carried its burden. But what was the verdict in this case? The verdict was guilty, sir. Thank you. Absolutely. If the verdict were not guilty, I wouldn't be standing here in front of Your Honor. I'm not being critical. I'm being quizzical. Understood, sir. Thank you. But, yes, it was the government's burden at that point to show somebody – it's not good enough to say, hey, we found them in the house. Somebody had to have put them there, so therefore the jury's entitled to pick and choose who they want to put there. There has to be some sort of exercise of dominion or control under Brown, and also in the Moyet case, which is non-precedential, but where there was a gun found in the common area of the property, and absent the defendant admitting that it was his gun, this court concluded that there wouldn't be sufficient evidence to say whose gun it was. Mr. Enchikasa certainly was not on the premises when these devices were discovered. Therefore, he couldn't have actual possession of them. The only way they can be attributed to him is through constructive possession. I respectfully submit that that hasn't been made either, and I see my time has concluded. Thank you. Thank you. Good afternoon, Your Honor. Seth Weber from government. I was trial counsel in this case. I'll deal with the antique issue first. As to why you indicted? As to why we indicted? Yeah. How did you get an operating sawed-off shotgun off the streets in Lehigh County? Well, it was already off the streets. You mean off the wall? Off the wall. Over the mantel? With a trigger lock that was test-fired by Special Agent Craze with the trigger lock on. But, you know, trigger locks, I grew up with rifles. This is a double-barrel sawed-off shotgun. It's not that hard sometimes. If the trigger lock is not manufactured specifically for the weapon, and a weapon this old is understandable that you wouldn't have one, it's not that hard to put a trigger lock on in such a way that you can still fire the gun with a trigger lock on that. It's not hard to do at all. And it was not hard to do in this case. Now, why did we charge in this case? And that's obviously not one of the issues before the court, but when you found the hoard of firearms, knives, hundreds of pounds of ammunition in this person's house, there's probably cause to believe we should probably take those away from this person. And you did. And we did. And you took the gun off the mantel, off the wall. We took the gun off the mantel because it was a sawed-off shotgun. Whether or not it was inherited by his great-grandfather, from his great-grandfather, or whether he found it on the street, or whether he bought it, or whether it was a gift, the law does not concern itself with how. But he seemed to be scrupulous in registering all of the other firearms, but for this one, so wouldn't that indicate to you that he didn't have the intent to evade the law here? It seemed like a person who was, except for the hand grenades, except for, you know, when it pertains to firearms, was attempting to comply. Well, that's a double-edged sword, yes. That's certainly one spin that can be put on it. I mean, this is an individual that had a Thompson submachine gun, knew that it had to be registered under the National Firearms Act. I didn't know you could register a Thompson submachine gun. And registered it. What are you, are you walking to the local town clerk saying, I'm going to register my submachine gun? There are certain conditions, and many Thompson submachine guns cannot be registered, but this was a registered Thompson submachine gun, registered by the defendant in his name, seized from his house on February 9th, the day the hand grenades were found. But obviously under Staples, you do need a, I mean, the reason I'm mentioning this, there is a mens rea requirement. Correct. So the issue here is, did he know that this sort of shotgun had to be registered? Now, if he mistakenly believed that, well, this is so old that maybe it doesn't have to be registered. This is an individual that had many firearms, many weapons, that may have to be registered. Some didn't have to be registered. And he made it his duty to find out what had to be registered and what didn't. For one reason or another, maybe it was the sawed-off shotgun that he thought was something that could be used one day for whatever purpose. Maybe he just thought it was an antique firearm. And I understand that, Your Honor. But the law has a special definition of antique firearms, and this is an individual that's not some person that has no knowledge or experience with guns. This is a person that takes such care in amassing weapons and further taking care of it, having a dehumidifier in the locked gun cabinet down in his basement, that he should know that it is a requirement that this firearm be registered. Well, is there a good argument that you don't know it's a requirement? Because after the word for in the definition in G of antique firearm, for which ammo is no longer manufactured and is not readily available, does for, do you interpret it to mean specifically designed for, that has ammo that's designed for it? Or is it ammo able to be used in? If it's the latter, you win. If it's the former, you lose. And I'll be darned if I can figure out what the statute's saying. Well, the government's position is that it's the latter. And it's the government's position on that because the statute says that the second part is not readily available in the ordinary channels of commercial trade. This is not some person that went seeking to find ammunition that fit into this 1870-whatever sawed-off shotgun. Is there any indication that this gun was ever even fired in the last 15, 20 years? There's no testimony about that presented on the record. The testimony presented on the record was it was taken down from the wall. The trigger lock remained on the one barrel. The ATF agent went to a local Wal-Mart store, bought 12-gauge shotgun shells, put it in, had no trouble, pulled the other trigger, it expelled the projectile, and so- Wait, what do you mean pulled the other trigger? Well, it's a double-barrel shotgun. So one trigger had the trigger lock on and the other did not. It did not go to both barrels. So pulled the other trigger and it expelled the projectile. So the question is, you know, do we look so closely and restrictive at the definition of antique firearm, or do we take the broader look that Congress wanted us to take in the Gun Control Act, which was we're going to exempt certain pieces maybe that should be put in a museum, maybe that are flint locks or muzzle loaders- But isn't that also a double-edged sword? Because you said that, you know, what did Congress intend? Congress intended to protect gun collectors of antique firearms. Well, they intended to exempt certain antique firearms that were defined in the statute. They did not intend to present or to protect firearm owners of old firearms that can still function in society today and that can cause violent crime. But why didn't they- I know the violent crime thing, because there's nothing about that in the statute. Why didn't they simply say that it's still operable? They didn't say that. They pinned it to whether or not, it seems to me, ammunition is no longer manufactured in the United States or readily available in the channels of commerce. You would agree that ammunition for this firearm is no longer manufactured. Ammunition for the firearm is no longer manufactured. It can still use ammunition that is manufactured, and that was what the Second Circuit hung their head on. But ammunition for that gun is no longer manufactured, and it looks like from the record it's also no longer readily available in commercial trade. Well, the testimony at trial, Your Honor, was that although it was an 18.2 caliber bore of the gun- the 12-gauge was used most likely back then, although the form of the 12-gauge shell may have been different. It may have been made out of paper, and now it's made out of some other material- that it is a 12-gauge shotgun. It's not as if since 1893 that new ammunition was developed and, yes, with some doing we can get that shell in there. This is a 12-gauge shotgun. This is a 12-gauge shotgun that takes 12-gauge shells. I mean, the problem I have with these words when you initially look at them- if you just pull G up, if you have it in front of you. I do. The last clause, and also any firearm using fixed ammunition manufactured in or before 1898. Let me stop you there. Does using-or, I'm sorry, does manufactured in or before 1898 refer to firearm or ammo? Firearm. I ultimately concluded it did, but the first question I had is, okay. The only way I can make sense of it is to read it the way you're doing. Agreed. For which ammunition is no longer manufactured in the United States and is not readily available in the ordinary channels of commercial trade. You need both. It's got to be manufactured-no longer manufactured in-or, I'm sorry. You have to show it's manufactured in the United States and it's readily available. Is that right? The tribunella court took a different tact on that. No, but what happened in the Second Circuit, though? What do you-what words did you get out of that? Because they looked at what the gun used. We're asking the court to adopt the reasoning in tribunella. That is that they are two separate factors to be considered and that if you meet one of those factors, that would exempt it from- Wouldn't it be or? I'm just trying to figure out the-my problem is I can't figure out-you might be right, but we're not getting a whole lot of help from either the words of the statute or any kind of legislative history, and this would-in my seven years here, this may be the first case that I've ever had where you talk about the rule of lenity actually making a difference here. When you look at Thompson Center Arms Co., the Supreme Court decision in that, if the statute's ambiguous, you cut the break in favor of the defendant. The government's position, Your Honor, is that the rule of lenity would not apply here, that the statute is not ambiguous because you can go to other case law and the legislative intent here on the Gun Control Act that would- Going to other case law doesn't mean the statute's not ambiguous. It just means other courts have interpreted the ambiguous language. And I believe, Your Honor, that the rule of lenity is pretty much a rule of last resort. If there's nothing that the court can look at- You know, we might be at our last resort here. What about the Gun Control Act and the terminology in the Gun Control Act? The Gun Control Act does cut both ways because they clearly said they weren't trying to penalize the collectors. And they also say that they don't want operable firearms regardless of their age. But they didn't put the term operable in the 5845. Right. And we're stuck with that language. A lot of antique firearms are operable, are they not? Yes. So the fact that this is operable doesn't mean he loses necessarily. The question is, does his gun qualify as an antique firearm? And if you were writing the statute or I were writing the statute, we would certainly write it a bit different if we wanted to go your way. We might. Hindsight is 20-20. But taking the words of the statute, the reasoning in tribunella, which was also adopted by the Seventh Circuit, together with the Gun Control Act, I think the broader intent of Congress in writing the antique firearm statute was a very, very limited exception, as they say, for types of firearms that you'd find in museums, muzzle loaders. They set out the flintlock-type firearms and things like that. Here, where you have a sawed-off shotgun capable of being used, for which, by the way, testimony presented at trial, there was 12-gauge ammunition for a shotgun found in the defendant's basement. He may have had other 12-gauge. Did he have 12-gauge shotguns in there? There were no other shotguns in the residence. The reason I raised tribunella is because the language of the court in that case. The court said, inter alia, the fact that the Gun Control Act restrictively defined antiques in terms of the type of ammunition the weapon could use reveals that Congress's overriding concern was for decreasing the violent use of guns. Thus, we conclude that the statutory scheme of pervasive regulation of firearms with an exemption for antiques, in quotes, but with the exclusion from the exemption of even old guns for which ammunition is still made or is readily commercially available reflects an intention on the part of Congress to exclude from regulation only those weapons that are unlikely to be usable for violent acts. Isn't that what this case is all about? That's what this case is about, Your Honor. And that's the position that the government is suggesting to this court in this circuit, to adopt the reasoning that is set forth in tribunella. But isn't part of the problem with tribunella, they're talking about... Use. We think this is what Congress probably meant, in effect. I mean, there's some real mushy language there. And that's kind of a weak read to go on. It's either clear or it's not clear. If it's not clear, then why is it in this particular case that you start guessing at what Congress is doing instead of just applying this seldom used rule of lenity? I understand Your Honor's question, and I think that the language in tribunella is not so mushy as the court may think. The words used in tribunella are, we conclude that the statutory scheme of pervasive regulation of firearms with an exemption for antiques, but with the exclusion from the exemption of even old guns for which ammunition is still made or is readily available, reflects an intention on the part of Congress to exclude from regulation only those weapons that are unlikely to be usable for violent acts. Further, they said that the Gun Control Act restrictively defined antiques in terms of the type of ammunition the weapon could use, and revealed Congress's overriding concern, and this was quoted by Judge Ackerman, for decreasing the violent use of guns. There's nothing mushy about those terms. It's pretty clear. But then one goes on to focus on the government's argument that it says it agrees with that looks at whether or not any ammunition usable in the weapon is readily available. And the term usable is not used that way, and it seems to me 5845 is not written in terms of whether or not the gun is operable or can fire ammunition that is ordinarily available. It's based upon whether or not ammunition is manufactured for that weapon, or whether or not such ammunition is obtainable. And you can argue that, well, they intended by that to get at whether or not ammunition was available, not whether or not it was manufactured for. But then I guess the question becomes whether or not the ammunition they're focusing on is ammunition that will work in the gun, which is not what they said. That gets us back to the operable line of questioning, or whether or not they're focusing on ammunition that was manufactured for that gun is available in commerce. Well, I think Tribunella focused on the word usable. It did. And they specifically say, if the ammunition made for other weapons is readily available in commercial channels and is usable in a pre- at that time the statute was 1899. It's been changed to 1898-firearm, it cannot be safely inferred that the pre-1899 firearm is never likely to be used as a weapon. We thus conclude that 5845 does not exempt such a firearm from requirements of the National Firearms Act. Well, I understand. If Congress had said any antique firearm manufactured whenever that is likely to be used as a weapon, they didn't flush that out and said something like, in considering whether or not it's likely to be used as a weapon, you may consider such things as whether or not ammunition is available which will fire from the weapon. Then you're in a different situation. But that's not what Congress said. You can argue that's what they meant. But it seems to me we've got to get past the language of the statute before we can get to that point. You may be right. If they attended that, they clearly could have said it better than they did. That's true, Your Honor. But we have to live with what the statute says. The second, I see my time is out. I haven't addressed the constructive possession. I don't have any questions on that. Okay. Your Honors, if there's one thing that's incontrovertible here in this case, it's the fact that Mr. Indra Ocasio was a firearms collector. And I respectfully submit to the Court that the language that's in this statute was put in by Congress in order to accommodate certain lobbies in the congressional arena, one of which was for gun collectors. The government is urging – Even if he's a collector, if he has a gun that's got to be registered, he's got to register the gun. Exactly, sir. The government is urging this Court to adopt Tribunella. Well, if we're going to adopt Tribunella, we can't just take the good parts. We've got to take the warts with Tribunella also, so to speak. And the Court in Tribunella specifically says that the statute is ambiguous. It says in Tribunella that the statute isn't clear, that they've got to look at this and they've got to wrestle with this ambiguous statute. And I agree with Judge Ambrose's assertion that if the statute is in fact ambiguous, if we're not quite sure what it is, then it's got to come down on the side of the defendant and come down on the side of strict construction. If the Congress wanted to say all they had to say in here was it's manufactured before 1898 and will not fire any commercially-readable or available ammunition, we wouldn't be standing here today, or I wouldn't be standing here today. That's not what they said. They put in there this specific language. It makes absolutely no sense to read this the way the Second Circuit did in Tribunella. And with all due respect to the Second Circuit, I think they had a very difficult factual situation, and I think the Court bent over backwards to come up with a construction that would allow them to sustain a conviction in a case that I think they felt strongly about on the facts. Was there any testimony about when the current form of shotgun ammunition with a rigid cardboard, whatever that is on the outside, when that was manufactured, when they started to manufacture that? There was no testimony in the record about that, Judge. The only testimony was that it was a paper cartridge that was originally set forth with these shotguns. And to say that the ultimate disingenuous argument is to say that if anything is capable of expelling a projectile, then it should be a firearm and not an antique would just take all the muzzle loaders completely out of it, out of the equation, because certainly... Would they specifically exclude those? Yes, but if you take the next logical step, then if you say, well, it's capable of expelling a projectile, then you're going to say, well, maybe Congress really didn't want to talk about muzzle loaders either, because a muzzle loader is capable of doing significant damage with a .50 caliber diameter ball coming out of that muzzle, and the fact that it's black powder and so forth is going to be pretty meaningless, unfortunately, to someone who shot with it. So the fact that it expels a projectile I think is a complete red herring, and I respectfully ask the panel to strictly construe that statute and also back in and take another look at my brief in terms of the constructive possession argument. Thank you. Thank you. We'll take the matter under advisement and call the last case, which is U.S.